COURT OF APPEALS
DECISION
DATED AND FILED

July 13, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP407**

STATE OF WISCONSIN

Cir. Ct. No.  2018CV170

IN COURT OF APPEALS
DISTRICT III

JOHNATHON WILL,

   PLAINTIFF-APPELLANT,

V.

CHRISTOPHER SCHLOSSER AND PROGRESSIVE UNIVERSAL INSURANCE COMPANY,

   DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Polk County: DANIEL J. TOLAN, Judge. *Reversed and cause remanded for further proceedings.*

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    SEIDL, J.   Johnathon Will appeals a summary judgment granted in favor of Christopher Schlosser and his automobile liability insurer, Progressive Universal Insurance Company (hereinafter "Progressive"), which dismissed Will's

personal injury claim. Will cashed a $950 settlement check from Progressive sent with an attached document denominated "ADVICE FOR PAYMENT," which read, "Full and Final Settlement of all Bodily Injury Claims with Open Meds." The circuit court concluded that Will's cashing of the check constituted an accord and satisfaction between the parties, thereby limiting the defendants' further liability and warranting summary judgment in their favor.

¶2   On appeal, Will argues the circuit court erred in granting summary judgment because there were genuine issues of material fact as to whether Will had reasonable notice that the check he cashed was offered in full and final satisfaction of his claim.[1]  We agree and conclude that there are material issues of fact as to whether Will received such reasonable notice, thereby precluding summary judgment.  We therefore reverse the judgment and remand this matter for further proceedings.

### BACKGROUND

¶3   On November 3, 2016, Will was traveling on County Road F, approaching the intersection with County Road C, when his vehicle struck a vehicle driven by Schlosser.  Schlosser failed to yield the right of way from a stop sign at the intersection of the two roads, allegedly causing the collision.

¶4   Will commenced suit against Schlosser and Progressive, alleging negligence and seeking damages for his injuries arising from the accident.

---

[1]  In addition, Will argues that "public policy should not allow insurers to forcefully settle bodily injury claims without the signing of a clear and concise release of claims."  Will provides no citation to legal authority for this proposition.  Because we decide this case on other grounds, we need not reach this argument.  *See* ***State v. Castillo***, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (appellate courts not required to address every issue raised when one issue is dispositive).

2

Progressive answered on behalf of both defendants, and it asserted that Will's claim was barred by the doctrine of accord and satisfaction. Progressive ultimately moved for summary judgment, claiming Will's action was barred by the doctrine of accord and satisfaction.

¶5 On November 15, 2016, some twelve days after the accident, a representative from Progressive named Rachel Thompson spoke by telephone with Will in a recorded conversation.[2] Thompson called Will to discuss the accident, Will's injuries sustained in the crash, potential future treatment, and his special damages. The following facts are taken from a transcript of that telephone conversation submitted by Progressive via affidavit, which Will acknowledged was accurate.

¶6 In that conversation, Will informed Thompson that as a result of his injuries, he had missed twenty hours of work, over two days, at $16.50 per hour. Thompson calculated that Will had lost income in the amount of $330 as a result of the accident. Will also informed Thompson that he had out-of-pocket expenses of twenty dollars for prescriptions. Will's mother had taken him to the emergency room after the accident, and Progressive agreed to pay for the cost of that visit, which included an ultrasound of Will's heart and stomach. Will also stated that his stomach and lower back were sore from the accident. At the time of the accident, Will estimated his pain level to be a three out of ten, on a scale of one to ten, with ten being the highest.

---

[2] The computerized transcript of the telephone conversation incorrectly identified the Progressive representative as "Ms. Fox." Rachel Thompson provided an affidavit, however, indicating that she was the representative who spoke to Will and that the transcript incorrectly identified her as "Rachel Fox [sounds like]."

¶7      At the time of his phone call with Thompson, Will stated he felt a bit better and that his pain was getting better day by day.  Will stated that he had quite a bit of bruising, particularly on his stomach, that it hurt to bend over at work, and that he was stiff when he would wake up in the morning.  Will had been asked to follow up with his primary care doctor, but he felt that he did not need to do so.  Will did, however, tell Thompson that he planned to see a chiropractor.

¶8      After discussing the accident, the nature of Will's injuries, the past damages, and potential future chiropractic treatment, and due to Will's statement that he was "almost 100 percent," Thompson offered Will a settlement.  Thompson summarized the damages that Will discussed with her, and she proposed an offer that Will agreed accurately reflected the damages:

> [Thompson]: OK.  OK.  So, um, that's all the questions I have to ask in relation to the injuries.  Um, of course here, um, Johnathon, you would be entitled to, you know, the bodily injury claim which does cover, um, you know, pain, inconvenience, um, missed wages, um, and medical bills in relation to the accident.  Um, so right now, based off of here, uh, what you're telling me the injuries that you sustained, um, I can offer you $600 for the pain and inconvenience.  In addition to that, um, you know, we would cover your wages, uh, that you missed out on for the days, um, of work, which would be $330.  And then I would reimburse you for, uh, your out-of-pocket, uh, prescription costs of $20.
>
> [Will]:  OK.
>
> [Thompson]: And then, of course, take care of, um, the medical bill, uh, that you had for the ER visit.  Um, your medical bills incurred, I should say, that you've in-, incurred thus far.  Um, and then you said, um, you haven't scheduled a follow-up visit?  Um ...
>
> [Will]:  Uh-uh.
>
> [Thompson]: ... you know, so, if you're anticipating that, um, you said you also, uh, potentially may go see a chiropractor, um, I can keep, um, the medical open for an additional 30 days for up to $1,000.  So, if you do go back

4

in for that follow up, um, or go to see, you know, the chiropractor, we'd be able to take care that for you, um, and that would be, you know, open for 30 days from the date, um, that the agreement is, is binded [sic].

¶9      After Thompson and Will discussed these valuations and summarized the terms of the agreement, Will said to Thompson that the payment amount would be fair and "should be all right."  Will then stated that the $1,000 for thirty days of future chiropractic would be all that he needs:

> [Thompson]: OK.  'Cuz total, what it would be, I know I just threw a lot of numbers at you.  I apologize [laughs]. Um, it would be total with, um, your pain, inconvenience, plus your wages and the out-of-pocket prescription, that'd be $950.  And of course, again, we would take care of the, your medical bills incurred thus far in relation to the accident, and then ...
>
> [Will]:  So, then the emergency …
>
> [Thompson]:  … um …
>
> [Will]:  … room will be covered?
>
> [Thompson]: Yes.  Yep, that will be covered.  Um, and then your concern for, you know, future follow up or treatment at the chiro, I can keep that open for 30 days up to $1,000.
>
> [Will]:  OK.  Yeah, that should …
>
> [Thompson]:  O-…
>
> [Will]:  …be all right.
>
> [Thompson]:  OK.
>
> [Will]: I would like to see the chiropractor, and I don't think that's …
>
> [Thompson]:  Sure.
>
> [Will]:  … gonna rack up bad [sounds like] …
>
> [Thompson]:  Yeah, and …
>
> [Will]:  … so.

5

[Thompson]: … typically, um, you know, the visits do range, if you do, um, go to, um, seek treatment, um, they're usually anywhere, depending on the area that you live in, I'd say $45 to $75. So, you know, that would, um, get you visits. You know, 30 days at …

[Will]: OK.

¶10     Thompson and Will then discussed the process for concluding the agreement:

[Thompson]: OK. So, what I have to do then, Johnathon, is, um, I have to send you out what's called a release. It's an official document, um, that basically outlines the details of our agreement. However, um, we would need that signed and on file before we're able to pay any medical bills on your behalf.

[Will]: OK.

[Thompson]: Um, and I'll send that out in the mail, um, along with the check ….

[Thompson]: … But I will get this out in the mail right away and I'll look to follow up with you tomorrow regarding the vehicle, um, you know, to go over that, which is, you know, separate from, um, this injury claim. Um other than that, um, I don't have anything else for you right now. Do you have any questions for me?

Will did not have any further questions, and Thompson thereafter provided her contact information should Will need to reach her.

¶11     The next day, Thompson sent Will a letter stating, in part: "As we discussed on November 15, 2016, you have agreed to settle your injury claim for $950.00." Thompson claims that enclosed with the letter was a check for $950, a document entitled ADVICE FOR PAYMENT with language stating, "Full and Final Settlement of all Bodily Injury Claims with Open Meds," and two copies of a release agreement. Will confirmed that he previously lived at the address where

the check was sent, but he had his mail forwarded to a new address after he moved.

¶12 Will also confirmed that the check "may have" had a letter attached to it, but he did not recall what that letter said and he was not sure if he kept it. Will stated, however, that no release was sent to him and that he did not sign or return any release to Progressive. In addition, and significantly, the record does not contain a copy of the purported release, either signed or unsigned.

¶13 Prior to the motor vehicle accident, Will had a surgery related to a hernia. On December 4, 2016, Will saw his family physician and stated that he was concerned that his hernia was coming back. The physician's note from that visit stated, in part: "[T]his is a time[-]sensitive issue[.] His insurance case will be closuring [sic], so he … does need this acted on quickly[.]" Progressive contends that this statement referenced Will's agreement with Thompson. Will, however, asserts that this statement was related to his health insurance coverage, which was expiring at the end of the year.

¶14 Based upon the phone conversation between Will and Thompson, Thompson's letter accompanying the check payable to Will, and Will's cashing the check, the circuit court concluded Progressive had made a prima facie case for summary judgment by showing that all the elements of accord and satisfaction were met. The court determined that Will's submissions did not establish a genuine issue of material fact as to accord and satisfaction, and it therefore granted Progressive's motion for summary judgment. Will now appeals.

**DISCUSSION**

¶15    We review a grant of summary judgment de novo. ***Duncan v. Asset Recovery Specialists, Inc.***, 2020 WI App 54, ¶9, 393 Wis. 2d 814, 948 N.W.2d 419. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2019-20). "To make a prima facie case for summary judgment, a moving defendant must show a defense which would defeat the [opposing party's] claim." ***Preloznik v. City of Madison***, 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983). If such a showing has been made, we examine the evidentiary materials submitted by the opposing party to determine whether a genuine issue exists as to any material fact. ***Id.*** "In evaluating the evidence, we draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." ***Burbank Grease Servs., LLC v. Sokolowski***, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781.

¶16    The issue for our review is whether the facts located in the summary judgment record, viewed most favorably to Will, demonstrate that his claim is barred by the common law doctrine of accord and satisfaction. "An 'accord and satisfaction' is an agreement to discharge an existing disputed claim and constitutes a defense to an action to enforce a claim," "whether the claim be one arising in contract, tort, or otherwise." ***Hoffman v. Ralston Purina Co.***, 86 Wis. 2d 445, 453, 273 N.W.2d 214 (1979); *see also* ***Butler v. Kocisko***, 166 Wis. 2d 212, 215, 479 N.W.2d 208 (Ct. App. 1991). "Ordinary contract principles apply in determining whether an agreement of 'accord and satisfaction' is reached." ***Hoffman***, 86 Wis. 2d at 453 (citation omitted). "Mere performance does not operate as a satisfaction unless offered as such to the creditor or claimant. There must be expressions sufficient to make the creditor understand or to make it

unreasonable for [the creditor] not to understand that the performance is offered in full satisfaction of the claim." *Id.* Our supreme court has explained how this doctrine applies when a debtor gives a settlement check to a creditor:

> Under the common law rule of accord and satisfaction, if a check offered by the debtor as full payment for a disputed claim is cashed by the creditor, the creditor is deemed to have accepted the debtor's conditional offer of full payment notwithstanding any reservations by the creditor. In other words, the creditor's cashing the full payment check constitutes an accord and satisfaction which discharges the entire debt.

*Flambeau Prods. Corp. v. Honeywell Info. Sys., Inc.*, 116 Wis. 2d 95, 101, 341 N.W.2d 655 (1984).

¶17 There are two elements that must first be present for a valid accord and satisfaction: (1) "there must be a good faith dispute about the debt"; and (2) "the creditor must have reasonable notice that the check is intended to be in full satisfaction of the debt." *Id.* at 111. An accord and satisfaction requires a "bona fide dispute as to the total amount owing, an offer, an acceptance and consideration." *Butler*, 166 Wis. 2d at 215.

**I. Whether the circuit court relied upon the Uniform Commercial Code**

¶18 The circuit court ordered that Will's claims be dismissed on summary judgment based upon the common law doctrine of accord and satisfaction. Nonetheless, Will contends that the circuit court relied upon the Uniform Commercial Code (UCC) in support of its conclusion that the doctrine of accord and satisfaction applies in this case. He argues that the court erred in doing so as the UCC is inapplicable to this tort action.

¶19    Progressive, however, correctly argues that the circuit court did not rely upon any UCC provisions in determining that Will's claim was barred by common law accord and satisfaction.  The *Hoffman* and *Flambeau Products* cases provide that the doctrine of accord and satisfaction is applicable under common law, and it applies to tort claims.  *See Hoffman*, 86 Wis. 2d at 453; *see also Flambeau Prods.*, 116 Wis. 2d at 101.  While contract principles are applied to an agreement to settle, this fact does not require the application of the UCC.  Will's assertion that the court erred by applying the UCC therefore lacks merit.

**II.  Whether material questions of fact preclude summary judgment**

¶20    Will next argues that there were material questions of fact preventing summary judgment on the application of common law accord and satisfaction.[3]  Resolution of this issue turns on whether there was a valid offer to settle.  Specifically, here, we must consider whether the second element of an accord and satisfaction was met—i.e., did Will have "reasonable notice that the check [was] intended to be in full satisfaction of the debt."  *See Flambeau Prods.*, 116 Wis. 2d at 111.  Will contends that there are material questions of fact whether he received any documents from Progressive with the check, and, specifically, whether he received the release.  He further asserts that based on Thompson's statements during her phone call with Will, in this particular case, the parties understood that the execution of a release was a necessary condition to resolving Will's claim.

---

[3] The Wisconsin Association for Justice filed an amicus brief in support of Will's position.

10

¶21 We agree with Will that the circuit court erred in granting the defendants summary judgment on this record. Both parties agree that part of the agreement reached pursuant to Will's phone conversation with Thompson was that she would send a release outlining the parties' agreement, and that this release needed to be signed in order for further medical payments to be made. There is a genuine issue of fact, however, as to whether Will ever received a release. According to Will's testimony, no release was ever provided to him, nor did he sign or return any release, and no copy of the release is in the record. The signing of the release was an express condition of the settlement. There is no question of fact that this signing did not take place. As the release was apparently meant to affirm the agreement between the parties, the absence of a sent or signed release creates a material issue of fact as to what the parties intended Will's acceptance and deposit of the $950 check to settle all of Will's claims.

¶22 Indeed, Will argues that there are material questions of fact as to whether Will understood—or should have understood from his conversation with Thompson—that the subsequent cashing of the $950 check acted as a termination of his entire bodily injury claim. Will argues that based on his discussion with Thompson, he reasonably understood that he was settling only his claim to the date of the phone conference, and he did not understand that he was barred from ever making any future claim related to his injuries. According to Will, that reasonable understanding created a material question of fact as to whether he understood that the check was offered in full satisfaction of his claim, and that it manifested a clear intent in that regard.

¶23 In response, Progressive correctly notes that an offer and acceptance can occur even if there is no "meeting of the minds." *See* **Hoffman**, 86 Wis. 2d at 454 (citation omitted). Manifestation of intent to accept an offer can occur

through the offeree's words, or by the offeree's actions. *See id.* "[W]hen a party accepts, without objection, a check which he [or she] knows to be offered in full settlement of a disputed account, he [or she] is estopped from claiming in the future that the account has not been settled. The acceptance of the check constitutes a good accord and satisfaction." *Chicago & N.W. Transp. Co. v. Thoreson Food Prods., Inc.*, 71 Wis. 2d 143, 146, 238 N.W.2d 69 (1976). The problem with Progressive's argument here, however, is that material questions of fact remain as to whether the deposit of the check clearly expressed an intent to settle in full satisfaction of the entirety of Will's claim, including his damages for future pain and suffering from bodily injury, and whether Will's cashing of the check constituted an acceptance of that offer.

¶24 Nothing in the conversation between Will and Thompson conclusively established that the amount agreed upon was intended to fully and finally settle all aspects of Will's claim for relief regarding his bodily injury, whether already existing or in the future. In fact, Thompson never used the word "settle" during her conversation with Will. Additionally, Thompson's discussion with Will regarding the release indicated that the release would outline the details of the agreement and that it was to be signed in order for Will to have Progressive pay any medical bills, not to settle his bodily injury claim. Furthermore, there is little evidence a release was ever received, much less signed. We do not know what the release said, and without it, there remains a genuine dispute as to whether the offer as made can be considered as accepted under the doctrine of accord and satisfaction. Without the release, we do not agree with Progressive and the circuit court that there is no material question of fact that Will's cashing the check establishes that there was reasonable notice to Will that he was accepting the $950 in full and final settlement of his negligence claim.

12

¶25 Will also argues that there was a material question of fact as to the basis for his statement to his doctor in December that he needed his hernia injury "acted on quickly." Will claims the circuit court could not rely upon that statement as evidence that he understood his agreement with Progressive was final and that he only had thirty days to obtain medical treatment. Instead, Will argues that there was a question of fact as to whether he was instead referencing a time limit due to his expiring health insurance. The court did not, however, state that it relied on Will's statement to his physician in support of its summary judgment decision. And, in any event, our summary judgment review is de novo, and we agree with Will that this issue further supports our ruling in his favor.

¶26 In summary, we agree with Will that there are genuine issues of material facts on the current record that preclude summary judgment in the defendants' favor. There are questions as to whether the agreement between Will and Progressive required a signed release, and whether Will understood that by cashing Progressive's check, he was fully and finally settling the full value of his bodily injury claim. On this record, these material factual questions must be resolve by a fact finder. The circuit court therefore erred in granting Progressive's motion for summary judgment. For these reasons, we reverse and remand for further proceedings.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

Not recommended for publication in the official reports.